IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2011 NOV -8  PM 4: 23

CROSSROADS SYSTEMS, INC.,
                    **Plaintiff,**

-vs-                                              **Case No.  A-10-CA-652-SS**

3PAR, INC., AMERICAN MEGATRENDS, INC.;
RORKE DATA, INC.; D-LINK SYSTEMS, INC.;
CHELSIO COMMUNICATIONS, INC. (a
Delaware corporation); ISTOR NETWORKS,
INC.; and CHELSIO COMMUNICATIONS, INC.
(a California corporation),
                    **Defendants.**

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically the Report and Recommendations [#167] of Special Master Karl Bayer, Defendant

Rorke Data, Inc.'s [#170] and Plaintiff Crossroads Systems, Inc.'s [#172] objections thereto, and

Crossroads' response [#173] to Rorke's objections; Crossroads' Motion to Strike [#160]; and a

variety of unopposed motions [##139, 145, 153, 171].  Having reviewed the documents, the relevant

law, and the file as a whole, the Court now enters the following opinion and orders OVERRULING

Rorke's objections, SUSTAINING IN PART Crossroads' objections, and otherwise ACCEPTING

AS MODIFIED the Report and Recommendations of the Special Master.

At the outset, as a housecleaning matter, the Court GRANTS the parties' unopposed motions

[##139, 145, 153, 171].  Moreover, because the Court does not rely on the supplemental declaration

of Brian Berg in reaching its conclusion on claims construction, it DISMISSES WITHOUT

PREJUDICE Crossroads' motion to strike [#160].

## Background

In this patent case, Plaintiff Crossroads brings claims against Defendant Rorke, alleging the latter is infringing United States Patent 6,425,035 (the '035 patent) through, among other things, the making, using, and selling of various Rorke products.[1]  In its first amended answer, Rorke asserts various defenses and counterclaims, including claims for declaratory judgments of non-infringement and invalidity.

The Court, through Special Master Karl Bayer, held a technical tutorial on February 28, 2011, and a *Markman* hearing on March 8, 2011.  The parties were so generous in their evidentiary submissions to the Court, both during the hearing and afterward, that the warmth of this record-breaking Texas summer was as nothing, compared to the warmth the undersigned felt in his heart. On August 10, 2011, Special Master Karl Bayer issued his report and recommendations regarding claims construction.  The parties were comparatively miserly in their post-recommendation briefing, with Rorke objecting to only two of the Special Master's proposed constructions, and Crossroads simply objecting to the omission from the Special Master's report of the parties' previously stipulated list of terms and their constructions.

Now, for the following reasons, the Court overrules Rorke's objections, sustains in part Crossroads' technical objection, and otherwise accepts as modified the Report and Recommendations of the Special Master.

---

[1] Although this case originally involved two patents and eight defendants, the parties and issues in this case have since narrowed considerably. Specifically, Crossroads' Second Amended Complaint [#104] brings an infringement claim against Rorke only with respect to the '035 patent.

## Analysis

The Court first notes a procedural anomaly regarding the Special Master's report in this case. On August 10, 2011, when the Special Master issued his report and recommendations, United States Patent 7,051,147 (the '147 patent), and the claims constructions relevant thereto, were still at issue in this case. Naturally, therefore, the Special Master proposed constructions for disputed claim terms relevant to both the '147 and the '035 patents. However, because the only patent currently at issue in this lawsuit is the '035 patent, the Court neither considers nor accepts the Special Master's proposed constructions that are relevant solely to the '147 patent. Likewise, the Court declines to adopt the parties' stipulated constructions of terms unique to the '147 patent.

### I.    Stipulated Claim Terms

Per the stipulations [##117, 143] between the parties, the following terms in the '035 patent will be given the following constructions, for the purposes of this lawsuit:

| | |
|---|---|
| *Data*: | Information in a form suitable for use in a computing device. |
| *Fibre Channel*: | A known high-speed serial interconnect, the structure and operation of which is described, for example, in Fibre Channel Physical and Signal Interface (FC-PH), ANSI X3.230 Fibre Channel Arbitrated Loop (FC-AL), and ANSI X3.272 Fibre Channel Private Loop Direct Attach (FC-PLDA). |
| *Virtual Local Storage*: | Storage space, in a storage device that is remotely connected to an initiator device, such that the storage space apepars to the initiator device to be within or locally connected to the initiator device. |
| *Remote*: | Indirectly connected through at least one serial network transport medium. |
| *First Transport Medium*: | A first communications link. |

-3-

| | |
|---|---|
| *Second transport medium*: | A second communications link that is physically separate from the first transport medium. |
| *Map/Mapping*: | To create a path from a device on one side of the storage router to a device on the other side of the router. A "map" contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices. |
| *Buffer*: | A memory device that is utilized to temporarily hold data. |
| *Storage Device(s)*: | Any storage device, including, for example, a tape drive, CD-ROM drive, an optical drive or a hard disk drive. |

Finally, the parties agree the term "Connected To/Connects" needs no construction.

## II.  Disputed Claim Terms

## A.  Claim Construction Principles

When construing claims, courts begin with "an examination of the intrinsic evidence, i.e., the claims, the rest of the specification and, if in evidence, the prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1327 (Fed. Cir. 2001).

The words in the claims themselves are of primary importance in the analysis, as the claim language in a patent defines the scope of the invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. The inquiry into how a person of ordinary skill in the art understands a claim term provides an "objective baseline" from which to begin claim interpretation. *Id.* The person of ordinary skill in the art is understood to read a claim term not only in the context of the particular claim in which the term appears, but in the context of the entire patent, including the specification; thus, both the plain language of the claims and the context in which the various terms appear "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.

The specification also plays a significant role in the analysis. *Id.* at 1315. The Federal Circuit has repeatedly reaffirmed the principle that the specification "is always highly relevant . . . . Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In interpreting the effect the specification has on the claim limitations, however, courts must pay special attention to the admonition that one looks "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention, and not merely to limit a claim term." *Interactive Gift*, 256 F.3d at 1332 (internal quotation marks and citations omitted).

The final form of intrinsic evidence the Court may consider is the prosecution history. Although the prosecution history "represents an ongoing negotiation between the PTO and the applicant" and therefore "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise be."
*Phillips*, 415 F.3d at 1317.

Aside from the intrinsic evidence, the Court may also consult "extrinsic evidence," which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citing *Markman*, 52 F.3d at 980). While extrinsic evidence "can shed useful light on the relevant art," the Federal Circuit has explained it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic evidence in the form of expert testimony may be useful to a court for "a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318.  However, conclusory, unsupported assertions by an expert as to the definition of a claim term are not useful, and should be discounted.  *Id.*  In general, extrinsic evidence is considered "less reliable than the patent and its prosecution history in determining how to read claim terms," although it may be helpful. *Id.*

The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (quoting *Markman*, 52 F.3d at 976).  Thus, "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id.*  However, "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *Id.* (emphasis in original).  For example, no

construction is required if the requested construction would be "an exercise in redundancy," or if

"the disputed issue is the proper application of a claim term to an accused process rather the scope

of the term." *Id.* (quoting *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.

Cir. 1997); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d

1341, 1349 (Fed. Cir. 2001)).

**B.     Special Master's Proposed Constructions To Which There Are No Objections**

The parties do not object to the Special Master's report with respect to the following claim

terms and proposed constructions for the '035 patent:

| Claim Term | Proposed Construction |
|---|---|
| Implement access controls for storage space on the storage devices. | Provides controls which limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map. |
| Allow access from devices . . . to the storage devices using native low level, block protocol. | Permit or deny access using the native low level, block protocol of the Virtual Local Storage without involving a translation from high level network protocols or file system protocols to a native low level block protocol request. |
| Native low level block protocol (NLLBP) | A set of rules or standards that enable computers to exchange information and do not involve the overhead of high level protocols and file systems typically required by network servers. |
| Workstation | A computer having input/output devices intended for use by humans. |

Because the parties do not dispute the Special Master's construction of these terms, and because the Court finds them supported by the intrinsic and extrinsic evidence, the Court hereby accepts them without further discussion.

**C.      Special Master's Proposed Constructions To Which There Are Objections**

Rorke objects to the Special Master's report with respect to the following terms and constructions for the '035 patent:

| Claim Term | Special Master's Proposed Construction | Rorke's Proposed Construction |
|---|---|---|
| Device | No construction necessary | Computer |
| Access Control(s) | Controls which limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map. | Controls that use a map to permit a particular device to read data from or write data to a particular storage space assigned to the device, and to prevent the device from reading data to or writing data from storage space assigned to other devices. |

**1.      Device**

The Court accepts the Special Master's recommendation, and finds this term needs no construction, for several reasons.  First and foremost, there is little benefit to Rorke's proposed definition.  As noted above, a person of ordinary skill in the art reads a claim term not in isolation, but in the context of the entire patent.  And within the context of the entire '035 patent, the term "device" needs, and indeed will bear, no single definition; rather, the term is limited by the context in which it appears.  For instance, in some places in the '035 patent, the term "device" is modified

-8-

by the word "storage," thereby limiting its scope.[2]  In other places in the '035 patent, for instance in Claim 1, the context requires a different scope.  In Claim 1, the described "device" is: (1) provided with virtual local storage on remote storage devices; (2) able to be connected to a transport medium; and (3) able to access storage devices.  Obviously, this limits the generic term "devices" substantially, but not necessarily in a way that is synonymous with the word "computer," as that term would have been understood by a person of ordinary skill in the art at the time of the '035 patent. In light of the context provided by the language of the '035 patent, the Court sees no need to depart from the ordinary and customary meaning of the term "device."

Second, in the context of the '035 patent, there is little difference in ambiguity between the term "device," and the term "computer."  Rorke has not demonstrated to the Court that people of ordinary skill in the art would even substantially agree on the definition of a "computer," much less agree that the "devices" described in the '035 patent meet that definition.  The Court sees little reason to substitute one ambiguous word for another, particularly when both words necessarily will have their contours defined mostly by the surrounding language of the patent.

Accordingly, the Court overrules Rorke's objections on this point, and accepts the recommendation of the Special Master.

---

[2] An examination of the term "storage device" is instructive on two additional points. First, although Rorke maintains the term "device" needs a specific construction, Rorke is apparently satisfied to construe the term "storage device" simply by restating the term, and then reciting a non-exhaustive list of such devices.  It is unclear to the Court why a person of ordinary skill in the art would understand "storage device" to mean "storage device," but would feel compelled to construe the more general term "device" in a specific and narrow way.  Second, Rorke's proposed construction of the term "device" seems incompatible with its proposed construction of the term "storage device": presumably, Rorke would not argue a person of ordinary skill in the art would understand the term "storage device" to be synonymous with "storage computer."  The Court is disinclined to depart from the ordinary and customary meaning of a word, and worse, create two different meanings for the same word, when it is not necessary to do so.

2.      **Access Control(s)**

The Court accepts the Special Master's proposed construction of this term for two reasons. First, Rorke's proposed construction seeks to limit the general term "access" to mean only reading and writing. Undoubtedly, some (or perhaps most) of the "access" described by the '035 patent is reading and writing, but nothing in the intrinsic or extrinsic evidence convinces the Court that a person of ordinary skill in the art would understand this to be the only possible "access" contemplated by the '035 patent. Again, the Court feels the term "access" is properly limited by the context in which it appears in the patent. For instance, if a specific device is capable of "accessing" a particular storage device in a way other than by reading from or writing to it, the language of the '035 patent appears potentially broad enough to cover such access. The fact that reading and writing are the predominant form of access does not necessarily disclaim other types of access.

Second, Rorke's proposed construction is clearly intended to define "access control(s)" in such a way as to exclude a single subset of storage shared by two or more devices. Although there is some language in the '035 patent that supports Rorke's position, the Court finds it is ultimately untenable.

The strongest support for Rorke's position from the '035 patent is found in column 4, lines 58–59: "Further, no access from a workstation 58 is allowed to the virtual local storage of another workstation 58." At first glance, this language certainly suggests access from one workstation to its assigned storage is exclusive.

However, this language is contradicted by other parts of the '035 patent. For instance, Figure 3 clearly shows a storage device 60, with an assigned subset of data 65, which is shared by all workstations. This is obviously not consistent with the requirement that all workstations have their

own private subsets of data, which are inaccessible to other workstations.

Further, the '035 patent uses broad language when describing how data can be assigned to workstations: "According to the present invention, storage router 56 has enhanced functionality to implement security controls and routing such that each workstation 58 can have access to a specific subset of the overall data stored in storage devices 60, 62, and 64." '035 patent, col. 4, ll. 7–11. Nowhere in this language does it suggest such access is necessarily exclusive. A similar description appears shortly thereafter: "Storage router 56 combines access control with routing such that each workstation 58 has controlled access to only the specified partition of storage device 62 which forms virtual local storage for the workstation 58." *Id.*, ll. 29–32. Although this latter statement indicates a workstation's access is limited to the storage space assigned to it, it says nothing about exclusive access, much less mandatory exclusive access.

The Court acknowledges Rorke's position is supported by some language in the '035 patent. However, because this isolated statement is at odds with both Figure 3, and the other patent language describing Figure 3, the Court finds Rorke's argument unpersuasive. There is no question the '035 patent describes configurations in which a particular workstation has exclusive access to particular subsets of storage devices. There is likewise no question the '035 patent describes configurations in which all workstations can access the same subset of a storage device. This is flatly at odds with Rorke's argument. *See* Rorke's Objections [#170] at 6 ("[W]e know that 'access control' is a one-to-one correspondence, and no 'global storage' or 'shared storage' is allowed.").

Accordingly, the Court finds that a person of ordinary skill in the art, having read the entirety of the '035 patent, would have understood that the '035 patent allows for global storage, as depicted in Figure 3. Thus, the Court overrules Rorke's argument on this point, and accepts the

recommendation of the Special Master.

## Conclusion

In accordance with the foregoing, the following table lists the relevant claim terms for the
'035 patent, and the Court's constructions thereof:

| Claim Term | Construction |
|---|---|
| Data | Information in a form suitable for use in a computing device. |
| Fibre Channel | A known high-speed serial interconnect, the structure and operation of which is described, for example, in Fibre Channel Physical and Signal Interface (FC-PH), ANSI X3.230 Fibre Channel Arbitrated Loop (FC-AL), and ANSI X3.272 Fibre Channel Private Loop Direct Attach (FC-PLDA). |
| Virtual Local Storage | Storage space, in a storage device that is remotely connected to an initiator device, such that the storage space apepars to the initiator device to be within or locally connected to the initiator device. |
| Remote | Indirectly connected through at least one serial network transport medium. |
| First Transport Medium | A first communications link. |
| Second Transport Medium | A second communications link that is physically separate from the first transport medium. |
| Map/Mapping | To create a path from a device on one side of the storage router to a device on the other side of the router. A "map" contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices. |

| Buffer | A memory device that is utilized to temporarily hold data. |
|---|---|
| Storage Device(s) | Any storage device, including, for example, a tape drive, CD-ROM drive, an optical drive or a hard disk drive. |
| Connected To/Connects | No construction necessary. |
| Implement access controls for storage space on the storage devices. | Provides controls which limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map. |
| Allow access from devices . . . to the storage devices using native low level, block protocol. | Permit or deny access using the native low level, block protocol of the Virtual Local Storage without involving a translation from high level network protocols or file system protocols to a native low level block protocol request. |
| Native low level block protocol (NLLBP) | A set of rules or standards that enable computers to exchange information and do not involve the overhead of high level protocols and file systems typically required by network servers. |
| Workstation | A computer having input/output devices intended for use by humans. |
| Device | No construction necessary. |
| Access control(s) | Controls which limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map. |

Accordingly,

IT IS ORDERED that Defendant Rorke Data, Inc.'s Objections [#170] are OVERRULED;

IT IS FURTHER ORDERED that Plaintiff Crossroads Systems, Inc.'s Objections [#172] are SUSTAINED IN PART;

-13-

IT IS FURTHER ORDERED that the Report and Recommendations [#167] of the Special Master are ACCEPTED AS MODIFIED;

IT IS FURTHER ORDERED that the parties various unopposed motions [##139, 145, 153, 171] are GRANTED;

IT IS FINALLY ORDERED that Crossroads' Motion to Strike [#160] is DISMISSED WITHOUT PREJUDICE.


SIGNED this the 8th day of November 2011.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

652 r&r ord mjh.frm                        -14-